# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

D'ANDRE L. WILLIAMS, by and through ) 
his Guardian ad Litem, DAVID WILLIAMS, ) 
                                  ) 
       Plaintiff, ) 
                                  ) 
       v. )           No. 4:04-CV-631 CAS
                                  ) 
CITY OF BEVERLY HILLS, MISSOURI, ) 
et al., ) 
                                  ) 
       Defendants. ) 

## MEMORANDUM AND ORDER

This matter is before the Court on a motion for summary judgment filed by defendants City of Beverly Hills, Missouri ("Beverly Hills"), Beverly Hills Police Officer James Thiel, City of Pine Lawn, Missouri ("Pine Lawn"), and Pine Lawn Police Officer Josh Fox. Plaintiff opposes the motion. For the following reasons, defendants' motion for summary judgment will be granted on plaintiff's claims under 42 U.S.C. § 1983, and the Court will decline to exercise supplemental jurisdiction over plaintiff's state law claims and will dismiss the same without prejudice.

**Background**.

This is an action asserting claims under 42 U.S.C. § 1983 and state law. Plaintiff D'Andre Williams was seriously and permanently injured on May 6, 2002, when an automobile in which he was a passenger crashed during a police pursuit. Plaintiff alleges that the defendant police officers rammed the automobile in which he was a passenger with their police vehicles and caused it to go out of control and crash. Williams, through his guardian ad litem and father, David Williams, asserts federal claims under section 1983 against the two police officers for unreasonable seizure in violation

of the Fourth Amendment and for substantive due process claims in violation of the Fourteenth Amendment. Plaintiff asserts federal claims under section 1983 against the officers' employing municipalities based on unconstitutional custom and policy and for failure to train, supervise, control and discipline the officers. Plaintiff also asserts state law claims against the officers for assault and battery and negligence, and against the municipalities for negligence.[1]

**Summary Judgment Standard**.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029

---

[1]Plaintiff also sued the driver of the automobile, Marcus Fort, for negligence (see Count XI of the Complaint). Plaintiff obtained a Clerk's Entry of Default against Fort on November 30, 2004. Plaintiff's claims against Fort are not at issue in the instant motion for summary judgment.

(8th Cir. 2000); <u>Allen v. Entergy Corp.</u>, 181 F.3d 902, 904 (8th Cir.), <u>cert.</u> <u>denied</u>, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Herring</u>, 207 F.3d at 1029 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. <u>See</u> <u>Crossley v. Georgia-Pacific Corp.</u>, 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." <u>Armour and Co., Inc. v. Inver Grove Heights</u>, 2 F.3d 276, 279 (8th Cir. 1993).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

**Facts**.[2]

---

[2]Local Rule 4.01(E) requires that a memorandum in support of a motion for summary judgment have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and if so, the appropriate citations. "Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portion of the record, where available, upon which the opposing party relies. The opposition party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." E.D. Mo. L. R. 4.01(E).

Plaintiff responded to many of defendants' statements of material fact merely by stating that a fact was disputed and then offering citations to the record, a good many of which were irrelevant or which did not serve to create an issue of material fact. In order to meet his affirmative burden to designate specific facts showing there is a genuine issue for trial, <u>see</u> <u>Hernandez v. Jarman</u>, 340 F.3d 617, 622 (8th Cir. 2003), Fed. R. Civ. P. 56(e), plaintiff must <u>state</u> the facts that contradict the facts of the moving party, and then provide citations to support the specific facts asserted by the plaintiff.

**A. Facts Relating to the Pursuit and Crash**.

Although the parties hotly dispute many of the key facts underlying this action, the defendants properly recognize that the Court must view the facts in the light most favorable to the plaintiff, the non-moving party, in connection with the instant motion for summary judgment.

This case arose on Mays 6, 2002. Defendant Marcus Fort testified that he was driving a 2001 silver Mitsubishi Mirage, the keys of which had been given to him by a person Fort believed to be the owner of the car. At approximately 2:00 p.m., Fort drove to Normandy High School and picked up Normandy High School students Shannon Raggs, Racquel Gladney, and plaintiff D'Andre Williams, to give them a ride home. Fort knew Raggs and Williams but there were no prearrangements for Fort to take Raggs, Williams or Gladney home that day.

Fort testified that he left the school parking lot and drove north on Lucas and Hunt Road, turning onto Maywood with the intention of dropping off passenger Raggs. Fort first saw a Beverly Hills police car parked near the corner of Avondale and Myron. Fort made a rolling stop through the stop sign at the intersection of Avondale and Myron in front of the police car, and turned on to Myron. When Fort turned on to Myron, he was facing the police car. The officer swerved his car to cut Fort off, and Fort swerved to avoid hitting the police car, drove up over the curb, onto a lawn,

---

It is not sufficient merely to state that a fact is disputed and then cite to the record. See Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir.1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (internal citation omitted); c.f. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991)). Although the Court has viewed all facts in the light most favorable to plaintiff, plaintiff's method of responding to defendants' statement of material facts did not comply with the Local Rule and greatly complicated the Court's task. Because plaintiff has failed to affirmatively state his version of the facts concerning the pursuit, the Court will simply describe the testimony of each of the three other passengers in the car.

and back out onto the street going in the same direction. Fort drove away from the police car on Avondale toward the intersection of Avondale and Natural Bridge Road. The police car followed Fort on Avondale, with both its lights and siren on by the time Fort arrived at Natural Bridge.

Fort knew the police car following him was trying to pull his car over, but Fort fled east on Natural Bridge toward the City of St. Louis, traveling over the speed limit. Fort did not see another police car until he arrived at the corner of Natural Bridge and Jennings Station Road, when at that intersection two police cars tried to "box [him] in," one positioned ahead of him and one behind him. Fort testified that the police car positioned behind him at the intersection was not the Beverly Hills police car that had been following him, but rather a Pine Lawn police car that had been at the intersection.

According to Fort, the only collision between a police car and the Mitsubishi occurred after Fort passed through the intersection of Natural Bridge and Jennings Station Road, when a Pine Lawn police car struck the rear passenger side of Fort's car. Fort testified this collision forced his car across the street where it struck a parked car.

Passenger Gladney testified that she got into the front seat of the Mitsubishi at the student parking lot at Normandy High School after Fort asked if she wanted a ride home. Raggs and Williams then approached Fort and asked if they could have a ride home. Raggs and Williams got in the back seat of the Mitsubishi, Raggs behind the driver and plaintiff Williams on the passenger side behind Gladney. Fort left the parking lot and "kind of started to speed" down Lucas and Hunt Road toward Myron and swerving between cars, and Gladney asked him why he was "driving crazy." Gladney Dep., Pl.'s Ex. H at 33:1-25. Fort made a right turn onto Myron and rolled past a stop sign and "the police was there and that's when the chase began." Id. at 31:3-23. Gladney again asked

Fort why he was driving crazy and asked, "What are you doing?"  After Fort ran the stop sign, all of the passengers asked to be let out of the car.  Gladney testified, "Once he ran a stop sign he then started driving very crazy and everybody asked to be let out of the car and he replied, 'No, I got this,' or something like that."  Id. at 36:14-17.

Gladney testified that after Fort ran the stop sign, a police car that had been parked on the side of a street started following the Mitsubishi, and Fort started to speed.  Gladney could not estimate the speed, but testified that it seemed dangerous to her and she was frightened.  Gladney testified that the pursuing police car was from Velda Village Hills or Velda City, and at some point turned on its red lights and siren.  Fort turned onto Natural Bridge Road and the police car followed and at least one other police car was behind the first.  Gladney testified that at the intersection of Natural Bridge and Kienlen,[3] a police car came out from the side street, Kienlen, and hit the Mitsubishi on the passenger side, where Gladney was sitting, toward the rear of the car.  Gladney could not see who was driving the police car or what police department it was from.  Gladney testified that the Mitsubishi then hit a parked car and a wall or pole or building, and then swerved into the opposite traffic lanes, striking one or two cars coming from the opposite direction, ultimately coming to a stop.  Id. at 66:20-69:25.  Once the Mitsubishi crashed, Fort got out of the car and ran.  Gladney was bruised on her knee and stomach and had a scratch on her ear, but was able to get out of the car on the driver's side with assistance.  Gladney also testified that she remembered the Mitsubishi being bumped from behind at one point, but could not remember exactly how many collisions there were between the Mitsubishi and a police car, stating, "One, two, maybe. . . .  I don't know how many

---

[3]According to the record, Jennings Station Road become Kienlen on the south side of Natural Bridge Road.

exactly, I don't remember how many, I know we were hit by the police car before [Fort] actually drove into the building." Id. at 85:10-17.

Passenger Raggs testified that after he got into the Mitsubishi, Fort was driving thirty miles an hour in a twenty-mile per hour zone on Lucas and Hunt going toward Myron Street. Raggs was seated in the rear seat behind the driver, Fort. Raggs testified that Fort stopped at stop signs, including the stop sign at the intersection of Myron and Avondale. Fort tried to make a fast "sharp left" turn onto Avondale at the corner of Myron and Avondale, but could not complete the turn because there were three Beverly Hills police cars blocking the street off. As soon as the police saw Fort's car, they turned on their sirens. Fort tried to get away from the police by driving the car up on the sidewalk for a distance, then returned to the street and headed north on Avondale toward Natural Bridge Road. As this occurred, Raggs was asking Fort what he was doing and telling him to stop and let Raggs out of the car. Fort ran the stop sign at Avondale and Natural Bridge, then turned east onto Natural Bridge Road going at least fifty miles an hour, traveling in the right lane of two eastbound lanes. Natural Bridge is a busy street with two eastbound lanes and one westbound lane and room for cars to park on each side. Meanwhile, the three Beverly Hills police cars were following the Mitsubishi onto Natural Bridge Road. Raggs testified that after the Mitsubishi had traveled approximately six blocks on Natural Bridge, a Beverly Hills police car hit the Mitsubishi in the rear, just in front of a 45 Minute Cleaners. Raggs did not know who was driving the Beverly Hills police car.

Raggs testified that three seconds after the Mitsubishi was hit in the rear by the Beverly Hills police car, it was hit on the driver's side by a Pine Lawn police car that came out of a side street on the left side of Natural Bridge, and then another three seconds later, the Mitsubishi crashed into

oncoming traffic. Raggs testified that "we all collided, the Pine Lawn, us and oncoming traffic." Raggs Dep., Defs.' Ex. E, Pl.'s Ex. B, at 50:18-51:1, 52:1-53:24; 54:4-55:23. Raggs was knocked unconscious as a result of the crash and woke up to find plaintiff Williams laying on his lap.

As a result of the crash, plaintiff Williams suffered a severe brain injury and has been in a coma since May 6, 2002.

**B. Facts Relating to Municipal Liability Claims**.

Defendant James Thiel had been an officer with the Beverly Hills Police Department since November 2001. Thiel graduated from the Police Academy less than two years prior to the incident at issue in this case, and received his certificate of completion for a twenty-four hour course on Defensive Driving Tactics on November 28, 2001. Thiel received pursuit driving training at the Police Academy but did not receive training in Pursuit Intervention Tactics ("PIT") maneuvers. Officer Thiel testified that ramming a vehicle would have violated the policies of the Beverly Hills Police Department. Thiel had been involved in between five and ten prior pursuits while an officer with Beverly Hills.

Defendant Josh Fox was an officer with the Pine Lawn Police Department since April 2001. Fox graduated from the Police Academy. Fox completed a twenty-four hour course in Defensive Driving Tactics, which included pursuit driving, on April 12, 2001. Officer Fox testified that ramming a vehicle to effect a seizure would be a use of excessive force and that this tactic was not allowed under the Pine Lawn Police Department policy.

The Beverly Hills Police Department "Standard Operating Procedure Manual" (the "manual") allows for "emergency operations when responding to an existing emergency or when in pursuit of an actual or suspected violator of the law." Defs.' Ex. O. The Beverly Hills manual has a six and

one-half page detailed standard operating procedure section on the permissible actions and restrictions placed on any officer involved in a high-speed pursuit, allowing an officer to exceed the speed limit with caution and extreme care, and to proceed past a stop sign with caution.

The manual states that use of a high speed pursuit to apprehend fleeing violators "presents a clear and present danger to Police Officers involved, to private citizens and to property." Id. at 301. The manual directs officers to "consider the present danger, seriousness of the crime involved, length of the pursuit, and the possibility of identifying the suspect at a later date when deciding whether to initiate and/or continue a high speed pursuit." Id. Officers are also directed to consider the "speed of vehicle, weather and traffic conditions, maneuverability and condition of the Police unit and road conditions." Id. The "Policy" section of the manual states, "High speed pursuit should be attempted only when, in the judgement [sic] of the Police Officer, the danger created by the possible escape of the fleeing violator outweighs the danger created by the high speed pursuit and no reasonable alternative exists." Id. at 302. The procedure manual directs that a police officer in an authorized emergency vehicle may initiate a high speed pursuit when three criteria are met:

> 1. The suspect exhibits the intention to avoid arrest by using a vehicle to flee the scene of an alleged felony which would normally require a full custody arrest or when the necessity of immediate apprehension outweighs the level of danger created by the pursuit and;

> 2. The suspect operating the vehicle refuses to stop at the direction of the Police Officer ; and

> 3. The suspect, if allowed to flee, would present immediate danger to human life or serious injury.

Id.

Police Chief Joseph Collins of the Beverly Hills Police Department testified that Beverly Hills police officers were not allowed to ram cars with their police vehicles to effect an arrest on a pursuit, but could only ram cars as a "life-saving measure," for example, "If that car was bearing down on someone and my car was between them and the person that they were trying to, attempting to strike or something. Not to effect an arrest." Collins Dep., Pl.'s Ex. L, 24:4-25:16. Former Beverly Hills police officer Sergeant James Jones, who was Commander of Field Operations in May 2002, testified that the Beverly Hills Police Department policy does not allow officers to ram another vehicle, "not in any circumstances." This policy was oral, and was based on the written policy. Jones Dep., Defs.' Ex. Q, 30:2-11.

Former Police Chief Donald Hardy of the Pine Lawn Police Department was unable to state which of two written vehicular pursuit policies was in effect in Pine Lawn at the time of the incident at issue. The less-detailed policy provides, "Before initiating a pursuit an officer, keeping in mind the ideals and goals of good law enforcement, must consider the seriousness of the offense involved and if the perpetrator presents a continuing danger to the public safety. He should take into account prevailing traffic and road conditions." Defs.' Ex. T at 30, ¶ 5-3. The policy also provides:

A. An officer initiating a pursuit must immediately advise the dispatcher of his location and direction, description of the car, and reason for the pursuit.

B. Supervisors will call off a pursuit if circumstances indicate that continuing the pursuit would result in a greater danger to the public.

C. Normally the dispatcher should assign an assist unit. All other police vehicles should refrain from joining the pursuit.

D. Other routine radio traffic will stop until the pursuit is terminated. The dispatcher will notify other police agencies (if necessary) by point-to-point radio.

E.  If the pursued vehicle is stopped or lost, the officer should immediately notify the dispatcher.

Id. at 30-31.

The second, more detailed Pine Lawn policy contains a three and one-half page section on vehicle pursuits.  See Defs.' Ex. S at 5-8.  The policy's stated purpose is "to establish written policies and procedures for vehicular pursuit situations and to stress that the responsibility and necessity to effect the arrest must be balanced against overall consideration of both officer safety and public safety."  Id. at 5.  The policy states in part that "[a] vehicle pursuit may be initiated only when an officer has probable cause to believe the violator has committed a felony or non-traffic misdemeanor. . . .  Pursuits for traffic violations alone cannot justify extreme speeds and hazardous driving.  Consideration should be given to early termination of pursuits whenever the pursuit creates a danger to the officers and the public."  Id. at 5.  The policy requires that red light and siren must be used at all times when in pursuit, and provides guidance as to when a vehicle can be pursued into another jurisdiction and when a pursuit should be terminated.  With respect to termination, the policy states in part,

> Pursuing officers and the pursuit supervisor must consider the present danger, seriousness of the crime involved, length of the pursuit and the possibility of identifying the suspect at a later time when determining whether or not to continue the pursuit.  Such things as speed of vehicles, weather conditions, presence of other traffic, amount of maneuvering, condition of the police vehicle and roads are all factors that need to be evaluated in determining the present danger of the pursuit.

Id. at 6-7.

For purposes of the instant motion for summary judgment, the Court will assume that the less-detailed pursuit policy set forth in Defendants' Exhibit T was in effect at the time of the incident at issue.

11

Chief Hardy testified that under Pine Lawn Police Department policy, ramming was not allowed during a pursuit unless the pursued involved a felony. Assistant Pine Lawn Police Chief David Muser testified that Pine Lawn Police Department policy did not allow a police officer to ram a vehicle that was being pursued under any circumstances, including to stop the vehicle.

Every three years, Beverly Hills and Pine Lawn police officers must complete forty hours of training to update their skills. Every three years, all Beverly Hills police officers are required to take defensive driving courses offered through the St. Louis County Police Academy.

During the twenty-six years Chief Collins was police chief of the Beverly Hills Police Department, prior to the instant action brought by plaintiff, no claims had ever been made or brought against Beverly Hills which alleged that it was the policy or practice of the Beverly Hills Police Department to ram pursued vehicles. For the two to three year period prior to May 2002, Beverly Hills officers were involved in pursuits approximately once per month. Dawson Dep., Pl.'s Ex. W, 19:6-15.

During the three years Chief Donald Hardy was police chief of the Pine Lawn Police Department, prior to the instant action brought by plaintiff, no claims had ever been made or brought against Pine Lawn which alleged that it was the policy or practice of the Pine Lawn Police Department to ram pursued vehicles. Pine Lawn Assistant Chief Muser had been a police officer for more than thirteen years and was assistant chief of Pine Lawn at the time of the incident. Muser did not recall that any formal complaint of any kind had ever been made to the Pine Lawn Police Department concerning the ramming of a fleeing vehicle, nor was there a history of prior acts of ramming in the Pine Lawn Police Department. Chief Hardy was aware that some pursuits took place during his three-year tenure as police chief, but he could not recall how many. For the two to three

year period prior to May 2002, Pine Lawn officers were involved in pursuits approximately once per month.  Dawson Dep., Pl.'s Ex. W, 18:10-19:5.

**Discussion**.

**A.  Section 1983 Claims against Thiel and Fox**.

In Counts III and VIII of the complaint, plaintiff asserts that he was unreasonably seized with excessive force in violation of the Fourth Amendment when defendants Thiel and Fox rammed the car in which he was a passenger with their police vehicles.  In the same counts, plaintiff also alleges that Thiel and Fox's actions violated his Fourteenth Amendment substantive due process rights.  Defendants move for summary judgment on these claims.

First, defendants assert there is insufficient evidence that any seizure occurred because there is no evidence that either police car ever made contact with the Mitsubishi automobile in which plaintiff was a passenger, citing Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989) (a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*.").  In support, defendants argue that (1) there were no marks on the Mitsubishi vehicle in the place where defendant Fort testified he was rammed by the police cars; (2) there is no evidence any of the police vehicles which allegedly rammed the Mitsubishi had any visible damage; and (3) testimony from defendant Officers Thiel and Fox, Acting Chief Dennis Epps of the City of Wellston and witness Judy Candela was that no contact occurred between the police cars and the Mitsubishi.  Defendants correctly acknowledge, however, that the Mitsubishi's driver, Marcus Fort, and passengers Shannon Raggs and Racquel Gladney testified that one or more police cars hit the Mitsubishi, and therefore the Court must view these facts in the light most favorable to plaintiff, the non-moving party.  See Anderson, 477 U.S. at 247.  The Court therefore assumes for purposes of

summary judgment that the two police cars driven by defendants Fox and Thiel rammed the Mitsubishi vehicle in which plaintiff was a passenger, and does not further address defendants' argument that no seizure occurred.

Second, the defendants argue that if their vehicles did ram the Mitsubishi, the contact was constitutionally reasonable under the circumstances because of the manner in which defendant Fort was driving. To establish a violation of the Fourth Amendment in a section 1983 action, the plaintiff must demonstrate that a seizure occurred and that the seizure was unreasonable. McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003). "A Fourth Amendment seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority." Id. (citing Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). "Although seizure requires restraint of an individual's liberty, not every government act resulting in a restraint of an individual's liberty constitutes a seizure." Id. at 846-57 (citing Brower, 489 U.S. at 596-97). "To be a violation of the Fourth Amendment, the restraint in liberty must be effectuated '*through means intentionally applied.*'" Id. (quoting Brower, 489 U.S. at 597).

For purposes of the instant motion for summary judgment, the Court will assume that a seizure occurred when the defendant officers rammed the Mitsubishi with their police vehicles because it is alleged the officers intended to stop the Mitsubishi, which in fact crashed and came to a halt. See Broyer, 489 U.S. at 599-600; cf. Hawkins v. City of Farmington, 189 F.3d 695, 702 (8th Cir. 1999) (Fourth Amendment seizure occurred when a police officer moved his car onto the highway to stop a speeding motorcycle, because the officer accomplished the stop through means intentionally applied).

As the <u>Brower</u> decision makes clear, however, a seizure alone does not establish liability under section 1983. The seizure must be unreasonable. <u>Brower</u>, 489 U.S. at 599. An excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. <u>McCoy</u>, 342 F.3d at 848 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395-97 (1989)). "Reasonableness of a seizure is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene, irrespective of the officer's underlying intent or motivation." <u>Id.</u> (citing <u>Graham</u>, 490 U.S. at 396-97). "The reasonableness of force depends on the facts and circumstances of each case accounting for (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> (brackets and quotation marks omitted) (quoting <u>Graham</u>, 490 U.S. at 396). "Whether an officer's use of force is reasonable is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" <u>Id.</u> (quoting <u>Graham</u>, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-97.

Plaintiff also asserts a claim under the substantive due process clause of the Fourteenth Amendment.[4] The "substantive component of the Due Process Clause protects a private citizen

_____

[4]The Court notes that plaintiff could pursue a substantive due process claim only if no "seizure" occurred in this case. <u>See</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. at 842-43; <u>Helseth v. Burch</u>, 258 F.3d 867, 872 n.4 (8th Cir. 2001) (en banc). If a seizure occurred, plaintiff's claims would necessarily be analyzed under the Fourth Amendment. In <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989), the Supreme Court stated, "All claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under

against an abuse of power by an executive official that 'shocks the conscience.'" Helseth v. Burch, 258 F.3d 867, 870 (8th Cir. 2001) (en banc).  An intent-to-harm standard, rather than the deliberate indifference standard, applies to all § 1983 substantive due process claims based on the conduct of public officials engaged in a high-speed car chase aimed at apprehending a suspected offender.  Id. at 871.  The Supreme Court has held that a police officer does not violate substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender.  County of Sacramento v. Lewis, 523 U.S. 833, 853-54 (1998).  Only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the "shocks the conscience" test applied to high-speed pursuits.  Id. at 854.  The Eighth Circuit has held that "deliberate ramming of a fleeing suspect's car does not permit an inference of intent to harm under Lewis."  Helseth, 258 F.3d at 872.

The Court does not reach the issue of the reasonableness of the seizure or issues concerning substantive due process, because a threshold issue is dispositive of plaintiff's claims against defendants Thiel and Fox.  As the Eighth Circuit has explained, the capacity in which public servants such as Thiel and Fox are sued is extremely significant:

> Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both.  See, e.g., Murphy v. Arkansas, 127 F.3d 750, 754 (8th Cir. 1997). . . .  This court has held that, in order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity.  See Artis v. Francis Howell North Band Booster Ass'n Inc., 161

a 'substantive due process' approach."  See also California v. Hodari D., 499 U.S. 621, 626 (1991) (a police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment); Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989) (no Fourth Amendment seizure would take place where a "pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit," but accidentally stopped the suspect by crashing into him).

F.3d 1178, 1182 (8th Cir. 1998); Murphy, 127 F. 3d at 754. Because section 1983 liability exposes public servants to civil liability and damages, we have held that only an express statement that they are being sued in their individual capacity will suffice to give proper notice to the defendants. See Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); Egerdahl v. Hibbing Comm. College, 72 F.3d 615, 619-20 (8th Cir. 1995). Absent such an express statement, the suit is construed as being against the defendants in their official capacity. A suit against a public employee in his or her official capacity is merely a suit against the public employer. See Kentucky v. Graham, 473 U.S. 159, 165 (1985).

Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).

The complaint does not specify in what capacity plaintiff is suing defendants Thiel and Fox, who are named in the caption as "Police Officer James Thiel" and "Police Officer Josh Fox," and described in the body of the complaint as residents of the State of Missouri and police officers employed by Beverly Hills and Pine Lawn, respectively. See complaint at 2, ¶ 1; 3, ¶¶ 2-3. Because of plaintiff's failure to specify the capacity in which Thiel and Fox are sued, the Court must assume these defendants are sued only in their official capacities. See Artis, 161 F.3d at 1182 (if complaint does not specifically name public official in individual capacity, it is presumed he is sued only in his official capacity). As a result, the Court must construe the section 1983 claims against Thiel and Fox as being brought against their municipal employers, Beverly Hills and Pine Lawn. See Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 904-05 (8th Cir. 1999) (official-capacity claims against police board members must be treated as claims brought against municipality), cert. denied, 528 U.S. 1157 (2000). Plaintiff's section 1983 claims against Fox and Thiel in Counts III and VIII based on the Fourth and Fourteenth Amendments should therefore be dismissed.

"A political subdivision may not generally be held vicariously liable under section 1983 for the unconstitutional acts of its employees." Johnson, 172 F.3d at 536 (citing Monell v. Department of Soc. Services, 436 U.S. 658, 694 (1978)); see Kuha v. City of Minnetonka, 365 F.3d 590, 603 (8th

Cir. 2003) (a municipality may not be liable merely because it employs a tortfeasor; there is no respondeat superior liability under section 1983) (citing <u>Monell</u>, 436 U.S. at 691). Thus, Beverly Hills and Pine Lawn cannot be held vicariously liable for any unconstitutional seizure or substantive due process violation by Thiel or Fox.

**B. Municipal Liability**.

The Court now turns to defendants' motion for summary judgment with respect to plaintiff's claims against Beverly Hills and Pine Lawn in Counts IV and IX, which are titled "Failure to Instruct, Supervise, Control and Discipline Directed Against [the Municipal Defendants] Cognizable Under 42 U.S.C. § 1983."[5]

**1. Custom and Policy Claims**.

Plaintiff alleges in Counts IV and IX that defendants Beverly Hills and Pine Lawn are liable to him under section 1983 based on unconstitutional customs and policies that permitted the use of excess force to pursue and seize motorists and vehicles. The allegations against each municipal defendant are the same, specifically that Beverly Hills and Pine Lawn have "policies, customs, practices and usages that exist":

---

[5]Although the defendants' motion for summary judgment includes argument directed to a conspiracy claim against the municipal defendants, the Court does not read plaintiff's complaint to assert a section 1983 conspiracy claim. Conspiracy allegations must be pleaded with sufficient specificity and factual support to suggest a meeting of the minds. <u>Manis v. Sterling</u>, 862 F.2d 679, 681 (8th Cir. 1988). In order to prevail on a claim of conspiracy under section 1983, a plaintiff must show that two or more individuals conspired for the purpose of depriving him of his constitutional rights, and that an action was done in furtherance of the conspiracy which caused an injury or deprivation. <u>Marti v. City of Maplewood</u>, 57 F.3d 680, 685 (8th Cir. 1995). <u>See also</u> <u>Gometz v. Culwell</u>, 850 F.2d 461, 464 (8th Cir. 1988) (parties must reach agreement and conspire together to deprive the plaintiff of a federal right). The Court finds that plaintiff has not pleaded a conspiracy claim. In addition, plaintiff did not respond to defendants' argument concerning the alleged conspiracy claim, which would indicate a waiver of such a claim if it had been pleaded.

a.  to pursue motorists and vehicles and terminate the freedom of movement of citizens by using force and excessive force against citizens, without regard for the need for the use of force, or without regard for the legality of its use and affecting unreasonable seizures.

b.  to ratify misconduct of police officers by failing to correct or discipline officers who engage in misconduct.

c.  failing to receive, investigate and sustain complaints of officer misconduct.  This is a failure of the duty of [the municipality] to supervise and control its officers, which empowers the officers or causes the officers to believe they are empowered to engage in misconduct.

d.  the practice of the officers of the department to protect one another by failing to report misconduct of other officers, known or suspected, and by lying about incidents of misconduct if asked.  This phenomenon is commonly known as the code of silence.

Complaint, Count IV, ¶ 33a.-d.; Count IX, ¶ 68a.-d.

"A political subdivision may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional policy or custom of the subdivision."  Johnson, 172 F.3d at 536 (citing Monell, 436 U.S. at 694).  The Eighth Circuit carefully distinguishes between claims based on policy and those based on custom.  Kuha, 365 F.3d at 603-04.  A "policy" is an official policy, a deliberate choice of a guiding principle or procedure made by an official with authority.  Id.; Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  For a municipality to be liable, a plaintiff must prove that the municipal policy was the "moving force [behind] the constitutional violation."  Monell, 436 U.S. at 694; see also Board of Comm'rs v. Brown, 520 U.S. 397, 400 (1997) (holding that only "deliberate" action by a municipality can meet the "moving force" requirement).  In contrast, to prove a municipal "custom," a plaintiff must show: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit authorization of such conduct by

the municipality's policymaking officials after notice to the officials of the misconduct; and (3) the plaintiff's injury by acts pursuant to the municipality's custom, i.e., proof that the custom was the moving force behind the constitutional violation. Kuha, 365 F.3d at 604 (citations omitted).[6]

Thus, to avoid summary judgment on his claims against Beverly Hills and Pine Lawn based on unconstitutional policies or customs, plaintiff must shown a genuine issue of material fact as to whether violations of his constitutional rights occurred pursuant to a policy of Beverly Hills or Pine Lawn, or whether there was misconduct so pervasive among these municipalities' non-policymaking employees as to constitute custom or usage with the force of law. See Spencer, 183 F.3d at 905. The Court will address plaintiff's policy and custom claims separately.

### a. Unconstitutional Policy Claims.

"A corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies." Monell, 436 U.S. at 690. "A 'policy' is a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter is question.'" Hayes v. Faulkner County, 388 F.3d 669, 674 (8th Cir. 2004) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986)). "A policy is deliberately indifferent to a person's constitutional rights when its inadequacy is both obvious and likely to result in the alleged deprivation of constitutional rights." Russell v. Hennepin County, 420 F.3d 841, 847 (8th Cir. 2005) (citing Spencer, 183 F.3d at 906).

Beverly Hills' police procedure manual includes six and a half pages of detailed guidelines concerning the use of high speed pursuits. See Defs.' Ex. O. The manual states that use of a high

---

[6]The Court notes that a governmental entity can be liable under section 1983 based on an unconstitutional policy or custom even though no government official was found personally liable. See Doe v. Washington County, 150 F.3d 920, 922 (8th Cir. 1998).

speed pursuit to apprehend fleeing violators "presents a clear and present danger to Police Officers involved, to private citizens and to property." Id. at 301. The manual directs officers to "consider the present danger, seriousness of the crime involved, length of the pursuit, and the possibility of identifying the suspect at a later date when deciding whether to initiate and/or continue a high speed pursuit." Id. Officers are also directed to consider the "speed of vehicle, weather and traffic conditions, maneuverability and condition of the Police unit and road conditions." Id. The "Policy" section of the manual states, "High speed pursuit should be attempted only when, in the judgement [sic] of the Police Officer, the danger created by the possible escape of the fleeing violator outweighs the danger created by the high speed pursuit and no reasonable alternative exists." Id. at 302. The procedure manual directs that a police officer in an authorized emergency vehicle may initiate a high speed pursuit when three criteria are met:

> 1. The suspect exhibits the intention to avoid arrest by using a vehicle to flee the scene of an alleged felony which would normally require a full custody arrest or when the necessity of immediate apprehension outweighs the level of danger created by the pursuit and;
>
> 2. The suspect operating the vehicle refuses to stop at the direction of the Police Officer; and
>
> 3. The suspect, if allowed to flee, would present immediate danger to human life or serious injury.

Id.

As discussed in the facts section, the record is unclear as to which of two written vehicular pursuit policies was in effect in Pine Lawn at the time of the incident at issue. The less-detailed policy, which the Court assumes was in effect, provides, "Before initiating a pursuit an officer, keeping in mind the ideals and goals of good law enforcement, must consider the seriousness of the

offense involved and if the perpetrator presents a continuing danger to the public safety.  He should take into account prevailing traffic and road conditions."  Defs.' Ex. T at 30, ¶ 5-3.  The policy also provides:

> A.  An officer initiating a pursuit must immediately advise the dispatcher of his location and direction, description of the car, and reason for the pursuit.
>
> B.  Supervisors will call off a pursuit if circumstances indicate that continuing the pursuit would result in a greater danger to the public.
>
> C.  Normally the dispatcher should assign an assist unit.  All other police vehicles should refrain from joining the pursuit.
>
> D.  Other routine radio traffic will stop until the pursuit is terminated.  The dispatcher will notify other police agencies (if necessary) by point-to-point radio.
>
> E.  If the pursued vehicle is stopped or lost, the officer should immediately notify the dispatcher.

Id. at 30-31.

Plaintiff has not identified any official policy of either Beverly Hills or Pine Lawn which was unconstitutional on its face or as implemented, and which caused the alleged constitutional violation. In order to succeed on a policy claim, a plaintiff must show that a municipality's "policy caused or was highly likely to cause" the constitutional violation.  See Russell, 420 F.3d at 848.  In fact, plaintiff alleges in the complaint that defendants Fox and Thiel owed a duty to him under municipal "rules, regulations and policies" to operate their police vehicles "in a careful and prudent manner and to exercise the highest degree of care in the operation thereof."  Complaint, Count I, ¶ 11; Count VI, ¶ 48.  Plaintiff also asserts in opposition to the motion for summary judgment that defendant Thiel "knew that Beverly Hills policy did not allow ramming" and defendant Fox "knew that ramming was not allowed by Pine Lawn policy."  See Pl.'s Mem. Opp. Summ. J. at 11.  The Court notes that if the

municipalities' policies prohibited ramming, they cannot be held liable for officer conduct which conflicted with those policies. See Kuha, 365 F.3d at 607.

In support of his policy claims, plaintiff focuses on the fact that pursuits have occurred in the municipalities and raises issues concerning lack of training concerning ramming. These arguments miss the mark. Because plaintiff has not identified any official policy of either municipality as the moving force behind the alleged constitutional violation, and because neither policy discussed above appears obviously inadequate and likely to result in the deprivation of constitutional rights, plaintiff's unconstitutional municipal policy claims must fail. See Mettler, 165 F.3d at 1204.

### b. Unconstitutional Custom Claims.

As stated above, to prove a municipal "custom," a plaintiff must show: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials after notice to the officials of the misconduct; and (3) the plaintiff's injury by acts pursuant to the municipality's custom, i.e., proof that the custom was the moving force behind the constitutional violation. Kuha, 365 F.3d at 604 (citations omitted). Plaintiff must satisfy all three of these requirements in order to "come forward with evidence from which a jury could reasonably find the existence of a relevant municipal custom" in Beverly Hills or Pine Lawn. See Mettler, 165 F.3d at 1204.

"Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." Id. (citations

omitted).  However, "A single incident normally does not suffice to prove the existence of a municipal custom."  Id. (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (plurality opinion)).

### i. **Beverly Hills**.

Plaintiff relies on the following evidence to establish the existence of an unconstitutional custom in Beverly Hills: (1) in the two- to three-year period prior to the crash in which plaintiff was injured, Beverly Hills officers were involved in approximately one pursuit per month; (2) Beverly Hills officers received no training concerning ramming or PIT maneuvers;[7] (3) Officer Thiel was previously involved in between five and ten pursuits before the pursuit in this case; and (4) there is no record of an internal Beverly Hills police investigation allegedly conducted of Thiel's actions in connection with the pursuit in this case, although Beverly Hills Police Chief Collins testified that such an investigation occurred.

The Court finds that plaintiff's evidence fails to raise an issue of material fact as to whether there was a unconstitutional custom in Beverly Hills.  Plaintiff has presented no evidence of any previous complaints received by Beverly Hills concerning misconduct by its police officers, much less complaints that concerned police pursuits.  Plaintiff has presented no evidence that any other vehicle rammings or similar incidents occurred involving Beverly Hills officers.  There is no evidence that Beverly Hills failed to investigate previous incidents, including incidents similar to the one at issue here.  Plaintiff presents no evidence to support the assertions in his complaint that Beverly Hills officers have failed to report or lied about misconduct by other officers.  Moreover, even if the Court were to assume that no investigation of the incident at issue occurred, such an omission would not

---

[7]"PIT maneuver" refers to a Pursuit Intervention Tactics maneuver, a tactic in which a police officer drives alongside the rear of a fleeing vehicle, turns, and hits the vehicle's rear end, causing it to spin and stop.  Helseth v. Burch, 258 F.3d 867, 869 (8th Cir. 2001) (en banc).

establish that the lack of an investigation was a moving force behind Thiel's alleged misconduct. <u>See</u> <u>Mettler</u>, 165 F.3d at 1204. Plaintiff's assertion that defendants failed to train their officers concerning ramming or PIT techniques cannot establish any of the required elements of a custom claim, and is relevant, if at all, to plaintiff's failure to train claim.

Plaintiff's assertion that defendant Thiel was previously involved in between five and ten pursuits does not create material issue of fact on the custom claim, because plaintiff has offered no proof that any of these pursuits were improper, involved ramming, or caused a pursued vehicle to crash. Thus, there is no evidence of a widespread pattern of misconduct by Thiel in particular or Beverly Hills police employees in general.

As a result, the evidence on which plaintiff relies falls far short of establishing a genuine issue of material fact that a "continuing, widespread, persistent pattern of unconstitutional conduct" existed among Beverly Hills officers. <u>See</u> <u>Kuha</u>, 365 F.3d at 604. The mere fact that Beverly Hills officers, including defendant Thiel, participated in pursuits is not evidence of wrongdoing or unconstitutional conduct. Plaintiff's municipal liability claim against Beverly Hills based on an unconstitutional custom therefore fails.

## ii.  <u>Pine Lawn</u>.

Plaintiff relies on the following evidence to establish the existence of an unconstitutional custom in Pine Lawn: (1) in the two- to three-year period prior to the crash in which plaintiff was injured, Pine Lawn officers participated in approximately two pursuits per month; (2) Officer Fox had been involved in previous pursuits; (3) Pine Lawn does not offer pursuit training to its officers; (4) Pine Lawn gives its officers a policy manual to read but no further instruction on Pine Lawn's policies and procedures; (5) the Police Academy does not offer training on ramming or PIT maneuvers; (6)

the Pine Lawn Chief of Police, Donald Hardy, did not know which of two pursuit policies were in effect on the date of the incident; and (7) Pine Lawn officers testified that ramming was not allowed under any circumstances while the Chief of Police testified it is allowed in a "felony chase."

As discussed above with respect to Beverly Hills, the Court finds that plaintiff's evidence fails to raise an issue of material fact as to whether there was an unconstitutional custom in Pine Lawn. Plaintiff has presented no evidence of any previous complaints received by Pine Lawn concerning misconduct by its officers generally, or complaints concerning police pursuits in particular. Plaintiff has presented no evidence that any other vehicle rammings or similar incidents occurred involving Pine Lawn officers. There is also no evidence that Pine Lawn failed to investigate citizen complaints generally, or complaints concerning previous incidents similar to the one at issue here. Plaintiff has offered no evidence to support the allegations in his complaint that Pine Lawn officers have failed to report and have lied about misconduct by other officers.

Plaintiff's allegations concerning a lack of pursuit training for Pine Lawn officers is contradicted by evidence that defendant Fox and others received pursuit training at the Police Academy. Plaintiff's allegations concerning a lack of training on ramming or PIT maneuvers does not establish an issue of material fact as to his custom claim for the reasons discussed above with respect to Beverly Hills. The confusion on Chief Hardy's part as to which pursuit policy was in effect at the time of the incident does not serve to establish an unconstitutional custom, particularly where the Court has found that neither policy appears obviously inadequate and likely to result in the deprivation of constitutional rights. Similarly, the discrepancy between Chief Hardy's testimony that ramming could be allowed in felony cases and Fox's testimony that ramming was never allowed does not tend to establish any aspect of plaintiff's custom claim.

As a result, the evidence on which plaintiff relies falls far short of establishing a genuine issue of material fact that a "continuing, widespread, persistent pattern of unconstitutional conduct" existed among Pine Lawn officers.  See Kuha, 365 F.3d at 604.  The mere fact that Pine Lawn officers, including defendant Fox, participated in pursuits is not evidence of wrongdoing or unconstitutional conduct.  Plaintiff's municipal liability claim against Pine Lawn based on an unconstitutional custom therefore fails.

### 2.  **Failure to Train and Supervise**.

Plaintiff asserts in Counts IV and IX that Beverly Hills and Pine Lawn have the duty to "screen, train, supervise, discipline and otherwise control" their officers, and have "effectively abrogated or delegated the power to screen, train, supervise, discipline and control" their officers by "failing to act in the face of transgressions of which" the municipalities "knew or should have known."  Complaint, Count IV, ¶ 34, Count IX, ¶ 69.  Plaintiff alleges that if the municipal defendants had "affirmatively acted to properly screen and/or train [their] officers . . . or to properly supervise the officers or to discipline the officers when the officers conducted themselves in constitutionally violative ways, the constitutional deprivation" suffered by plaintiff would not have occurred.  Id.  Specifically, plaintiff alleges that the municipal defendants knew of their officers' practice of "pursuing motorists and vehicles and terminating the freedom of movement of citizens by using excessive force and force against citizens, without regard for the need for the use of force . . . . and affecting [sic] unreasonable seizures and of officers lying about the facts of the incident to cover and conceal misconduct, and of the persistent failure and refusal of officers to report violations of the constitution and laws, and when directly questioned about such violations, to lie about the incident."  Id., ¶¶ 37, 72.  Plaintiff alleges that the municipal defendants therefore intentionally disregarded

known facts, or in the alternative were deliberately indifferent to a risk of constitutional violation, which caused the violation of plaintiff's constitutional rights.  Id., ¶¶ 38, 73.[8]

### a.  Failure to Train.

A municipality may be liable in certain circumstances under § 1983 for constitutional violations caused by its failure to train employees.  A municipality may be liable for deficient policies regarding the training of police officers where (1) the municipality's training practices are inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting them, such that the "failure to train reflects a deliberate or conscious choice by a municipality," City of Canton v. Harris, 489 U.S. 378, 389 (1989); and (3) an alleged deficiency in the municipality's training procedures actually caused the plaintiff's injury.  Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (citations omitted).

A plaintiff in a failure to train case must show "that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably

---

[8]As a threshold matter, the Eighth Circuit has consistently recognized a general rule that in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.  See McCoy, 342 F.3d at 922-23 (holding that where officer's act of drawing his gun was "objectively reasonable," and the accidental discharge did not constitute an unreasonable seizure violating the plaintiff's constitutional rights, the city defendant could not be held liable on either an unconstitutional policy or custom theory or on a failure to train or supervise theory).  In this case, there can be no finding of individual liability for unreasonable seizure, excessive force or substantive due process violations on the part of defendants Thiel and Fox because they were not sued in their individual capacities.  The Court has been unable to determine whether the circumstances of this case offer an exception to the general rule that individual liability must exist before municipal liability may attach, or if the failure to sue the individual defendants in their individual capacities necessarily precludes a municipal liability claim for failure to train or failure to supervise.  Because of this uncertainty, the Court will proceed to address the merits of plaintiff's failure to train and failure to supervise claims.

be said to have been deliberately indifferent to the need." <u>Canton</u>, 489 U.S. at 390. "In other words, the plaintiff must demonstrate that the city 'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'" <u>Andrews</u>, 98 F.3d at 1076 (quoting <u>Thelma D. by and through Delores A. v. Board of Educ., City of St. Louis</u>, 934 F.2d 929, 934 (8th Cir. 1991)).

The uncontroverted facts show that Officer Thiel and Officer Fox were graduates of the police academy and had completed police academy defensive driving courses in 2001, the year before the incident at issue in this case. Both Thiel and Fox testified they had training in pursuit driving at the police academy. As detailed above, Beverly Hills and Pine Lawn have departmental policies and procedures which appear to comport with constitutional requirements in terms of directing and guiding their officers on high-speed pursuits. Thiel and Fox testified that they are instructed and controlled by the policies and procedures of their municipalities. Thiel and Fox also testified that ramming vehicles is prohibited by their municipalities' policies. <u>See</u> Thiel Dep., Pl.'s Ex. E, 44:23-45:2; 46:9-11; 48:7-49:7; Fox Dep., Pl.'s Ex. J, 40:13-17.

There is no factual basis in the record to conclude that the training offered by Beverly Hills and Pine Lawn to its officers was constitutionally deficient. <u>See</u> <u>Andrews</u>, 98 F.3d at 1076-77 (finding training was adequate against charge of sexual assault by police officer where city provided two weeks of on-the-job training with another officer, and officers were sent to the police academy for training within one year of being employed by the department); <u>Williams-El v. Johnson</u>, 872 F.2d 224, 230 (8th Cir.) (finding training was adequate against a charge of excessive force and denial of medical care where the city provided on-the-job training and required attendance at the police academy), <u>cert. denied</u>, 493 U.S. 871 (1989). The defendant officers in this case were police academy graduates who had received pursuit training and completed defensive driving courses the

year before the incident.  Both officers testified they were controlled by the policies of their respective departments concerning pursuits.  The Court has found those policies were not obviously inadequate or likely to result in the deprivation of constitutional rights.

Plaintiff's contention that the municipalities should have offered their officers training in ramming or PIT maneuvers does not establish a genuine issue of material fact on his failure to train claims.  Plaintiff has cited no cases in which courts have held that failure to train in ramming or PIT maneuvers resulted in a violation of constitutional rights where officers were trained in pursuits and defensive driving tactics.  In addition, there is no evidence in the record that Beverly Hills or Pine Lawn had notice that their procedures were inadequate or likely to result in a violation of constitutional rights.  There is no evidence that prior instances of ramming occurred in either municipality, or that any complaints concerning ramming were made to either municipality.  Thus, it cannot be said that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the municipalities were deliberately indifferent to the need.  See Canton, 489 U.S. at 390.

Under these circumstances, plaintiff has failed to establish the existence of material facts with respect to whether Beverly Hills or Pine Lawn's training policies were inadequate, whether the municipalities were deliberately indifferent to the rights of others in adopting the policies, and whether deficiencies in the training policies caused plaintiff's injury.  Defendants' motion for summary judgment should therefore be granted on plaintiff's failure to train claim.

### b.  Failure to Supervise.

A municipality may also be liable under section 1983 for failure to supervise its employees. A failure to supervise claim "may be maintained only if a defendant demonstrated deliberate

indifference or tacit authorization of the offensive acts." Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998) (quoted case omitted). "Thus, as with the failure to train claim, this claim is governed by the deliberate indifference standard." Id.

The Eighth Circuit has held that "where a § 1983 claim is based on a municipality's alleged failure to prevent misconduct by its employees, the city is liable only where municipal officials can be shown to be directly responsible for the improper actions of their subordinates. The claimant must demonstrate deliberate indifference or tacit authorization by municipal officials of the offensive acts by failure to take remedial steps following notice of a pattern of such acts by subordinates." Harris v. Pagedale, 821 F.2d 499, 504 (8th Cir.), cert. denied, 484 U.S. 986 (1987) (internal quotations, citations and punctuation omitted). Thus, to prove his case, plaintiff must show that Beverly Hills or Pine Lawn officials had notice of prior incidents of police misconduct and deliberately failed to act on this knowledge. See id.; see also Andrews, 98 F.3d at 1075 ("To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action.") (quoting Parrish v. Luckie, 963 F.2d 201, 204 (8th Cir.1992)).

The Court finds that plaintiff has failed to establish the existence of an issue of material fact as to the municipal defendants' deliberate indifference on his failure to supervise claim. As discussed above with respect to the unconstitutional policy claims, plaintiff has failed to establish any evidence of (1) past misconduct by Beverly Hills or Pine Lawn officers of any sort, much less involving vehicular pursuits, (2) which was brought to the municipalities' attention and ignored. Plaintiff's evidence that Beverly Hills and Pine Lawn officers have been involved in other vehicular pursuits is not evidence of misconduct. Thus, plaintiff has failed to establish that either municipality had prior

notice of offensive acts by its police officers, and deliberately failed to act on this knowledge. Plaintiff's assertions that Beverly Hills and Pine Lawn officers persistently fail to report violations of the constitution and laws by other officers, and lie about incidents of misconduct, are unsupported by any evidence.

Defendants' motion for summary judgment should therefore be granted on plaintiff's failure to supervise claim.

### C. State Law Claims.

The Court has dismissed or granted judgment in favor of the defendants on all of plaintiff's federal law claims under section 1983. Still pending are plaintiff's state law claims against defendants Fox and Thiel for negligence and assault and battery, against defendants Beverly Hills and Pine Lawn for negligence, and against defendant Fort for negligence.

It is within the discretionary authority of this Court to decline to exercise supplemental jurisdiction over state law claims once it has dismissed "all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see Reeve v. Oliver, 41 F.3d 381, 383 (8th Cir. 1994) (per curiam); McLaurin v. Prater, 30 F.3d 982, 984-85 (8th Cir. 1994). The Supreme Court has stated that if "the federal claims are dismissed before trial . . . the state claims should be dismissed as well." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Barstad v. Murray County, 420 F.3d 880, 888 (8th Cir. 2005) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

In the exercise of its discretion, the Court concludes that these factors weigh in favor of declining to exercise supplemental jurisdiction over plaintiff's remaining state law claims. Therefore, the Court does not address the remaining aspects of defendants' motion for summary judgment, which will be denied as moot, without prejudice.

**Conclusion**.

For the foregoing reasons, the Court concludes that plaintiff's claims under 42 U.S.C. § 1983 against defendants Officer Thiel and Officer Fox in their official capacities should be dismissed. Defendants' motion for summary judgment should be granted on plaintiff's claims under 42 U.S.C. § 1983 against defendants City of Beverly Hills and City of Pine Lawn. The Court will decline to exercise supplemental jurisdiction over plaintiff's state law claims and will dismiss the same without prejudice, and therefore will deny as moot the remainder of defendants' motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's claims under 42 U.S.C. § 1983 against defendants Officer James Thiel and Officer Josh Fox in their official capacities in Counts III and VIII are **DISMISSED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is **GRANTED** on plaintiff's claims against defendants City of Beverly Hills and City of Pine Lawn under 42 U.S.C. § 1983 in Counts IV and IX. [Doc. 30]

**IT IS FURTHER ORDERED** that the Court will decline to exercise supplemental jurisdiction over plaintiff's state law claims and will dismiss the same without prejudice.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment on plaintiff's state law claims is **DENIED as moot, without prejudice**.  [Doc. 30]

**IT IS FURTHER ORDERED** that defendants' motion to strike plaintiff's Rule 26 witness disclosures and "deposition" of Warren Tiller is **DENIED as moot**.  [Doc. 42]

An appropriate judgment and order of dismissal will accompany this memorandum and order.


**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  31st  day of March, 2006.